Michael **SOWICZ**

v.

**UNITED STATES of America**

v.

**NORTHERN METAL COMPANY.**

Civ. A. No. 70–2915.

United States District Court,
E. D. Pennsylvania.

Dec. 20, 1973.

Bert Zibelman, Freedman, Borowsky & Lorry, Philadelphia, Pa., for plaintiff.

Richard Meltzer, Asst. U. S. Atty., Philadelphia, Pa., for the United States.

Andrew C. Hecker, Jr., LaBrum & Doak, Philadelphia, Pa., for Northern Metal.

## FINDINGS OF FACT

NEWCOMER, District Judge.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact.

1. Plaintiff Sowicz was a sixty-two year old longshoreman who was employed in that capacity on December 18, 1969 by the Northern Metal Company, third party defendant herein.

2. Northern Metal was a stevedoring company which had entered into con-

tract DAHC 21–69–D–0055–P003 (hereinafter "contract") with the United States.

3. Pursuant to the contract, Northern Metal was to process and ship privately owned vehicles (hereinafter "POVs") which belonged to military personnel.

4. POVs were processed as follows:

(a) The cars were driven to Northern Metal by their owner or his designee and were stopped at the main gate.

(b) At the main gate the cars were directed to the POV building which is 300 to 600 feet away. There are two stop signs between the main gate and the POV building.

(c) The orders of the car owner (sponsor) were reviewed at the POV office to determine whether he was entitled, pursuant to Army regulations, to ship his vehicle. If so, Army-supplied form DD788 was completed as required by Army regulations.

(d) A Northern Metal employee, in the presence of the vehicle owner, examined each POV for external damage. Any such damage was noted on the Army-supplied form DD788 which was then signed by the owner.

(e) Pilferable items were removed from the vehicles, placed in a carton and locked in the trunks of the cars. A list of said items was made by Northern Metal pursuant to Army requirements.

(f) A Northern Metal employee then drove each vehicle to a degassing area pursuant to Army regulations. The brakes of the car were applied to assure that they were operational before the vehicle was driven from under the canopy of the POV office.

(g) If anything was found to be wrong with a car prior to its being loaded, a note to that effect was placed on the windshield of the car. Such a car would then be given special attention while being stuffed.

(h) The degassing area was between 150 feet and 300 feet from the POV office. There was one stop sign en route.

Cars were stopped by their own brake systems upon arrival at the degassing area.

(i) At the degassing area, cars were backed onto inclined ramps and gas was drained from them.

(j) The gas removed from the vehicles was the property of the United States government and was either picked up by the Army or put into vehicles shipped to the United States from foreign installations.

(k) After degassing the cars were driven approximately 400 feet to a storage area; there were two stop signs en route. The cars were stopped by their own brake systems at the storage area. When the vehicles reached the storage area, their hoods were opened and their engines were left running.

(l) When the engines stopped, batteries were disconnected, terminals were taped, and the cars were locked as provided in Army regulations. Keys were returned to the POV office.

(m) Cars remained in the parking or storage area from 15 days to a period of months. The Army's Military Sea Transportation System booked vessels on which military cargo was transported and arranged for arrival at Northern Metal of containers for use in shipping POVs when the ship was a container vessel.

(n) When a vehicle was booked on a container ship by the Army, it was towed with its battery still disconnected to the pier area with someone inside to steer. The cars were usually moved to the pier a day or more before being stuffed into containers. Upon arrival at the pier area, the cars were stopped by their own braking systems. Someone was inside to steer during these operations.

(o) Containers were stuffed on the day before the ship on which they were to be loaded arrived.

(p) Cars were brought from within the pier shed to the doorways of the pier with someone inside to steer; they were stopped at the doorways by their own braking power. When cars were moved

from within the pier shed to the pier itself, if the man steering detected any braking difficulty, he would tell others and the car would be pushed into a container by hand.

(q) Cars were pushed into containers by modified forklift trucks from which the forks had been removed and onto the front of which a tire had been placed. While a car was being pushed into a container, there was a longshoreman in it to steer.

(r) Cars had to be pushed up a ramp of approximately six inches to get into containers.

(s) POVs were stopped in the container by their own brakes.

(t) After the POV was stopped, each wheel would be chocked (secured) by the longshoreman working inside the container.

5. On December 18, 1969, plaintiff was working as a wood butcher at Northern Metal. It was not unusual for a longshoreman to be hired as a carpenter. Five wood butchers constituted a group. The group in which Sowicz was working included Charles Angelus (Sowicz's partner or breaster), John Galle, Tracey and a chock man, Stanley Sezpiel.

6. Plaintiff had never worked as a wood butcher in the past.

7. On December 18, 1969, containers were not being stuffed differently than at any other time over a period of years.

8. Between 3:00 p. m. and 5:00 p. m. on December 18, 1969, Sowicz was struck by a car being pushed into a container in which he was working.

9. The platform lights on the pier were on at the time of the accident.

10. Sowicz, at the time he was struck, was standing at the rear of a vehicle which had been chocked in the container. He was awaiting the arrival of a second vehicle.

11. The vehicle by which Sowicz was struck was being steered by William Taras (nickname, "Calhoun") who had been a longshoreman for 35 years. Michael Libucki was driving the forklift by which the vehicle was pushed into the container.

12. Taras had gotten into the car when it was near the doorway of the pier shed, approximately 10 or 15 feet from the container. This was his first contact with the car. The car was not moving when Taras got into it.

13. After the car which he was steering was pushed into the container, Taras applied the brake pedal which went to the floor. He yelled, "no brakes, no brakes." The full length of the car was in the container when he yelled.

14. Prior to the POV in question being pushed into the van, Taras the driver did not test the brakes.

15. Joe Rose, Burt Raskin (carpenter foreman), Adolph Kaspar (part-time timekeeper), Lt. Selman (an Army lieutenant stationed at Northern Metal) and Henry Guz (longshore gang boss) were at the scene of the accident after it occurred.

16. Several men tested the brakes on the vehicle after the accident and confirmed that the brake pedal went all the way to the floor. Kaspar does not remember testing the brakes himself or telling anyone that he did so. He does remember observing others test the brakes and he saw that the pedal went to the floor.

17. Lt. Selman made certain notes after the accident which pertained only to possible damage to the automobile.

18. Burton Raskin (carpenter foreman) made out an accident report which he gave to timekeeper Kaspar. Selman was talking to Raskin and Kaspar when Raskin delivered his report. The slip of paper on which Raskin made his report contained a notation regarding the number of the van in which Sowicz was working at the time of the accident. Kaspar, in his office, attached Raskin's notes by paper clip to a report which Kaspar himself made. While the report was on his desk, awaiting duplicating, Lt. Selman asked if he could have a

copy. Kaspar agreed and delivered the report to Selman. Although he looked for the report on many occasions, Kaspar was not able to locate it until, having returned to Northern Metal for a post-retirement visit, he found a copy in his old desk. Raskin's notes were not attached to the copy of the report.

19. The ranking military officer at Northern Metal had ordered that the Army be given copies of all accident reports immediately following an accident.

20. During the loading operation Army personnel were periodically present to observe the operation and to prevent damage or pilferage to the POVs.

21. Any request made by Army personnel to Northern Metal employees during the loading of the cars was in regard to the prevention of damage to the vehicles.

22. Northern Metal personnel were present to supervise their employees at each stage of the processing and loading operation.

23. The daily activities of the two to three members of the Army personnel present at the Northern Metal pier would consist of walking through the area noting cars that had pilferable items, and periodically observing the operation of the Northern Metal employees stuffing POVs into the containers. The purpose of these observations was to note any damage which might occur during the loading.

24. Army personnel had no authority to hire Northern Metal employees, pay their wages, fire Northern Metal employees, assign the men to perform specific tasks, or order them to begin or stop work.

25. The Army did not supply the tools such as tow motor, chocks, hammers or nails to the Northern Metal employees.

26. At no time did the Army or Northern Metal make a mechanical inspection of any of the vehicles brought to the pier for overseas shipment.

27. The defendant relied on its own military personnel to bring their privately owned vehicles to the terminal in good operating condition.

28. If the Northern Metal's employees were aware of a braking deficiency in any particular vehicle, they would make a notation of same and attach it to the windshield or side window of the car.

29. In cases where there was a "bad brakes" notation on the vehicle, the particular car would be handled with special care when being pushed into the container.

30. At times a vehicle with bad brakes would be pushed in by hand.

31. Lt. Selman said that when it came to his attention that a POV was not in safe operating condition, he would either see to it that the vehicle was repaired at the terminal or that it was shipped with information supplied to correct it at its point of destination.

32. At the time of the accident, plaintiff was working in one of the containers along with John Galle.

33. The container in question was approximately 35 feet in length, seven feet in width and a little over six feet in height.

34. Plaintiff and Galle had already chocked the first of the two vehicles intended for this container.

35. When a car was pushed into the container, the "driver" would attempt to center it as best as possible, leaving a little more space on the left side to facilitate his leaving the car, and would stop it by slamming the brakes.

36. Northern Metal's expert testified that the most likely cause of brake failure in the situation involved in this case was that a wheel cylinder in the brake system had failed causing a sudden and complete loss of the brakes.

37. The automobile which struck plaintiff was pushed back into the container and shipped overseas. No mechanical inspection was made on the

brakes of the POV in question to ascertain the reason for the failure because the identity of the owner or the car was not available.

38. This Court has jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. § 1346(b).

39. The United States did not breach its duty of care under § 388 of the Restatement of Torts because neither the sponsor nor the United States knew or should have known that the brakes on the vehicle which struck plaintiff were defective.

40. The Pennsylvania Motor Vehicle Code does not apply to the facts of this case.

41. The United States did not owe plaintiff a duty of care under § 392 of the Restatement of Torts.

42. The United States did not retain control over the manner in which the work was performed by Northern Metal.

43. The relationship between the United States and Northern Metal was one of independent contractor.

44. The third party defendant Northern Metal is not liable to the defendant United States of America for indemnity or contribution.

## DISCUSSION

This case presents for our disposition a number of questions under the Federal Tort Claims Act despite the fact that at first blush the accident which occurred herein arose out of a relatively simple sequence of events. Also, this case appears to be the first of its kind involving the stuffing of POVs into containers for shipment to servicemen overseas which has gone to trial against the United States.

Plaintiff sets forth several theories of liability under the Restatement of Torts namely sections 388[1], 392 and 414. We will discuss all of these theories in turn because each section does warrant some discussion as it applies to this case.

■ Plaintiff's theory of liability under § 388 is that the United States is liable to the plaintiff because it has been established that the POV in question was in a defective condition, that the POV's sponsor knew or should have known of that defective condition, and that said sponsor did not impart this information to a representative of the Northern Metal Company upon delivery of the vehicle knowing that Northern Metal Company would probably not discover the defect. We will hereafter explain why plaintiff's reasoning does not stand up under § 388.

The fact that the sponsor supplied a chattel which was defective at the time the accident occurred appears clear from the record. The brakes on the vehicle in question did fail to operate and we have so found. However, there is no evidence that the sponsor knew or should have known that the brakes of his automobile

---

1. Section 388 of the Restatement of Torts reads as follows:

"One who supplies directly or through a third person a chattel for another to use, is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be in the vicinity of its probable use, for bodily harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier (a) knows, or from facts known to him should realize, that the chattel is or is likely to be dangerous for the use for which it is supplied; (b) and has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be so."

Section 388 of the Restatement of Torts and Section 388 of the Restatement of Torts (Second) are identical in language with the exception of the phrases "or to be in the vicinity of its probable use" and "or to be endangered by its probable use." Pennsylvania has not yet adopted § 388 of the Restatement of Torts (Second). However, the difference in language between the two sections will not affect the outcome of this decision and therefore when reference is made to the comments which follow § 388, we will refer to the comments of Restatement of Torts (Second).

were defective. There is, however, evidence to support a finding that the brakes were not defective prior to the vehicle's coming to rest in the pier shed because the vehicle was driven to the Northern Metal pier under its own power and stopped under its own braking system on several occasions before it finally came to rest at the Northern Metal loading area. Mr. Duffy, manager of the Northern Metal POV operation, also testified that the instructions which he gave to his men were that the brakes be tested upon the initial receipt of the vehicle by simply pressing down on the brake pedal. Consequently, we find that the sponsor had no reason to know that his brakes were defective when the vehicle he was driving was delivered to the Northern Metal pier. Because the sponsor did not know or had no reason to know of the defective brakes, then the United States cannot be held vicariously liable to the plaintiff for causing the accident.

Plaintiff also asserts that the United States was a supplier of a chattel to the plaintiff because the United States is a bailee-bailor of the chattel involved. However, the same reasoning applies to the United States that applied to the sponsor of the vehicle under § 388. There is no evidence in the record which could support a finding that the United States knew or should have known that the brakes were defective.

Plaintiff argues that the sponsor and thus the United States violated 75 P.S. §§ 816(a), 816(r), and 817(a) and 817(b), by operating a motor vehicle without the required braking mechanisms as set forth in the statutes.

Plaintiff argues that as a consequence of such violations, the sponsor and therefore the United States were negligent *per se*.

Section 816(a) reads in pertinent part:

Every vehicle . . . when *operated* upon a highway, shall have brake equipment which is designed, constructed and maintained to meet the requirements prescribed by this section. (Emphasis supplied) 75 P.S. 816(a)

Section 816(r) reads:

Every motor vehicle of a passenger car or suburban type, registered in this Commonwealth and manufactured or assembled after June 30, 1967, and designated as a 1968 or later model, shall be equipped with a service brake system of such design that rupture or failure of an actuating force component of any single brake shall not result in complete loss of braking function. The braking function may be obtained by hydraulic or other means through the normal service brake mechanism.

"Actuating force component" as used in this clause shall mean the brake master cylinder, brake actuating cylinder, brake line, brake hose, or similar components performing like functions if the brake systems are other than hydraulic.

In the event of rupture or failure of an actuating force component, the unaffected brakes shall be capable of applying an adequate braking force to the vehicle. 75 P.S. 816(r)

Section 817(a) reads:

It shall be unlawful for any person to *operate* a motor vehicle or a combination of vehicles upon the highways of this Commonwealth with brakes not conforming with the requirements of this act. (Emphasis supplied) 75 P.S. 817(a)

Section 817(b) reads in pertinent part:

It shall be unlawful for any person to operate a motor vehicle without the required number of brakes in good working condition. . . . (Emphasis supplied) 75 P.S. 817(b)

We do not believe that the statutes set forth above apply or were intended to apply to the factual situation confronting the Court in this case. First, Section 816(a) appears only to apply to vehicles which (a) are operated (b) on a highway. By using the word

"operated", we believe that the Pennsylvania Legislature intended to mean driven under its own power. Towed vehicles are permitted on the public highways without brakes, and the fact that they are without brakes is often the reason for their being towed. The statutes would clearly not apply to towed vehicles. The vehicle which was shoved into the container and which struck plaintiff Sowicz was not, we believe, being "operated" within the meaning of Section 816(a) because its engine was not running and in fact could not have been running at the time of the accident because the battery attached to its engine was disconnected and there was no gasoline either in the tank or the carburetor with which to start the engine. Also, the vehicle was not being operated on any highway of the Commonwealth at the time the brakes failed.

■ Section 816(r) could apply to the vehicle in question if we had any evidence of the date of its manufacture and its model year designation. Neither exists on this record and all parties blame the others for failing to produce the automobile in question.

■ This failure to produce the vehicle or failure to identify the vehicle which caused the accident brings up an important question involved in this case. The question is whether or not we can infer from the fact that the vehicle was not identified by the United States or Northern Metal or the plaintiff for that matter that the evidence would have been unfavorable to whomever had the duty to identify and produce it. The reason why an inference arises from a failure to produce evidence on behalf of the party in whose control the evidence resides and which his opponent claims would aid in determining the facts of the case is that the party failing to produce fears that the evidence would be detrimental to his case. See Wigmore on Evidence § 285.

Plaintiff asserts that the United States had the primary obligation to at least identify the vehicle in question.

But the military representative at the Northern Metal pier was not concerned with the safety of the Northern Metal personnel and was not required to make out a personal injury accident report of any kind. The notations which Lt. Selman made in his note pad related to the physical condition of the vehicle after it struck plaintiff after the accident. The vehicle was then pushed back into the container by Northern Metal personnel and was shipped overseas. The vehicle is not being kept out of court by some conspiracy to do so, and the government at trial had no more ability to produce the vehicle than did the plaintiff. Furthermore, there is no more likelihood that the plaintiff would benefit from a mechanical inspection at this juncture than would the government because Northern Metal's expert testified that the brake failure was probably caused by a failure of a wheel cylinder. If a wheel cylinder failure was the cause of the accident, a mechanical inspection would not have conclusively indicated that the cylinder was about to fail. We do not believe that defendant is attempting to withhold evidence from the plaintiff in this case, and, therefore, we will not infer from the fact that the automobile was not available to plaintiff for testing and inspection that the data obtained therefrom would have been detrimental to the defendant and favorable to the plaintiff.

■ Sections 817(a) and (b) likewise apply to vehicles which can be driven under their own power and those statutes are not apposite to this case.

Because we are of the opinion that the sections of the Pennsylvania Motor Vehicle Code set forth above do not apply to the defendant in the instant case, the defendant is not negligent *per se,* and plaintiff must prove his case by showing actual negligence.

■ Negligence of course is the failure to do what is reasonable under the circumstances or the doing of an act which is unreasonable under the circumstances. Plaintiff argues that the fail-

ure of the government to mechanically inspect every car which was received at the Northern Metal pier and the reliance by the government on Northern Metal's cursory brake test when the car was received constituted negligence. The only problem with this argument is that the evidence tends to establish that the brakes on the car in question were operating at least to the point at which the vehicle finally came to rest and where it remained until just prior to its being stuffed into the container. There is no evidence as to why the brakes failed or that the government acted unreasonably under the circumstances.

This accident could have been avoided if William Taras, the driver of the vehicle, had tested the brakes himself just prior to the shove from the fork lift truck. Taras could have put his foot on the brake pedal to see if the brakes were still there. Indeed the strong probability that an injury of the type incurred here would occur because of the vulnerability of a longshoreman placed in plaintiff's position inside the container would dictate that someone test the brakes on all the vehicles just prior to their being shoved into the container. The test would be nothing more than putting one's foot on the pedal. The duty to require such a test or enforce such a test should be placed on the employer Northern Metal because Northern Metal has the obligation to provide plaintiff with a safe place to work and the United States does not because they have not retained sufficient control over the manner in which the work is performed.

Defendant contends that what we have here in this case is the mere happening of an accident without any proof of what caused the accident to happen. To hold otherwise would require us to impose a form of absolute liability on the United States and this we are unable to do. We have found no case which supports plaintiff's claimed liability as against the United States in a situation where an independent contractor is involved. We agree with the defendant that the United States cannot be held liable to the plaintiff under § 388 of the Restatement because there is no proof that the sponsor of the vehicle or the government knew or had reason to know of a defect in the brakes on the vehicle which struck plaintiff.

 Plaintiff additionally argues that under § 392 [2] of the Restatement of Torts (Second), the government would be liable for failing to inspect the POVs which are received for shipment overseas. Section 392(b) does impose a duty to inspect on a supplier if the chattel which is supplied is to be used for the supplier's business purposes. First, neither the sponsor nor the United States is engaged in the business of shipping POVs to servicemen despite the fact that the shipment of such vehicles appears to be a large operation. The shipment of POVs is provided as a fringe benefit to certain servicemen and as such is a gratuity paid for by the United States. But even if we assume for the moment that the United States was negligent in not inspecting the brakes in question, plaintiff has failed to show that such negligence was a substantial factor in bringing about the accident.

It is clear that the brake failure in this case was a substantial factor in bringing about the accident which caused plaintiff's injuries. Again, the best that can be said is that an accident

---

2. Section 392 of the Restatement of Torts (Second) reads as follows:

"One who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by persons for whose use the chattel is supplied

(a) if the supplier fails to exercise reasonable care to make the chattel safe for the use for which it is supplied, or

(b) if he fails to exercise reasonable care to discover its dangerous condition or character, and to inform those whom he should expect to use it."

occurred, but that plaintiff has failed to establish who, if anybody, was at fault.

The only remaining issue with which we must deal is whether or not the government is liable to plaintiff under Section 414[3] of the Restatement of Torts (Second). Although plaintiff did not raise the issue of whether or not the United States retained control over any part of the work under the terms of the contract entered into between the government and Northern Metal, the Court feels compelled to state its position on this question.

We are of the opinion that the government did not retain sufficient control over the actual stuffing process to subject it to. the provisions of § 414. The military representatives stationed at Northern Metal were there to see that the contract was being honored and to report damage to the cargo and prevent pilferage.

The general provisions of the contract namely Section I, Section TP–2(c)(1)[4] and Section GP–3[5] are not sufficient to make the Northern Metal Company an employee of the United States for purposes of the Federal Tort Claims Act. All of the equipment, tools, chocks, nails and hammers used to secure the vehicles were supplied by Northern Metal, and the actual details of the stuffing process were controlled by Northern Metal. The prime concern of the government was to see to it that the work was performed in accordance with the contract, and the basic details of the work were left to the discretion of Northern Metal. See Fisher v. United States, 441 F.2d 1288 (3rd Cir. 1971) and the cases cited therein.

Any statements of fact or law found in this Court's discussions regarding lia-bility or damages which have not been specifically enumerated in the sections entitled "Findings of Fact" and "Conclusions of Law" respectively, are hereby designated "Supplemental Findings of Fact and Conclusions of Law."

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. § 1346(b).

2. The United States owed a duty of care to the plaintiff under § 388 of the Restatement of Torts.

3. The United States did not breach its duty of care under § 388 of the Restatement of Torts and therefore was not negligent because there is no evidence that either the sponsor or the United States knew or should have known that the brakes on the vehicle which struck plaintiff were defective.

4. The United States was not negligent *per se*.

5. Even if the United States did breach a duty to the plaintiff for failing to inspect the vehicle, the failure to do so was not a substantial factor in causing the accident.

6. The United States did not owe plaintiff a duty of care under § 392 of the Restatement of Torts (Second) because the United States was not in the business of supplying POVs to military personnel.

7. The relationship between the United States and Northern Metal was one of independent contractor.

8. The United States did not retain control over the manner in which the work was to be conducted.

9. The United States is not liable to the plaintiff for the injuries he sus-

---

3. Section 414 of the Restatement of Torts (Second) reads as follows:

"One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."

4. TP–2(c)(1)—*Preparing Vehicles for Shipment:* The contractor (Northern Metal) shall perform services necessary in preparing vehicles for shipment as directed by the Contracting Officer.

5. GP–3 *Changes:* The Contracting Officer may, at any time by a written order, and without notice to the sureties, make changes within the general scope of this contract.

tained as a result of the accident involved in this case.

10. The third party defendant Northern Metal is not liable to the defendant United States for indemnity or contribution.